```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                            CRIMINAL ACTION NO. 2:08-00283

**ANTONIO COLLINS**

<u>MEMORANDUM OPINION AND ORDER</u>

**Pending is defendant Antonio Collins' motion to suppress evidence, filed March 30, 2009.  The findings of fact that follow are made by a preponderance of the evidence received at the hearing on April 20, 2009.**

I.

On November 11, 2008, South Charleston Police Officers Halstead and Miller were working together in separate cruisers when Officer Miller spotted an occupied 1980 Chevrolet Caprice on an Enterprise car rental lot.  It looked out of place among the new cars on the rental lot.  Officer Miller ran a license check and, finding that the license plate on the Caprice was not the one recorded as issued for it, thought it may have been stolen. He radioed Officer Halstead to make a traffic stop of the Caprice once it moved off the car lot.  Officer Halstead did so by

initiating a traffic stop with his overhead lights flashing at a time when the Caprice approached Riverwalk Plaza, a mall in South Charleston.  The stop took place near a Kroger store in the mall.  The time was 5:26 p.m., just as it was starting to get dark.  With Officer Halstead's vehicle stopped immediately behind the Caprice, Officer Miller pulled his cruiser in behind Officer Halstead.

Officer Halstead went to the driver's door of the Caprice and asked the driver, James Collins, for his driver's license, registration card and insurance information.  The driver complied by handing the requested items, including also a temporary registration card, to Officer Halstead who informed the driver that he was stopped because the license plate on the vehicle did not match the registration.

Officer Miller had gone to the right side of the Caprice which had two passengers.  One was the defendant Antonio Collins, who is unrelated to the driver, seated in the front passenger seat.  The other was George Sawyer, a first cousin of the driver, who was seated in the back seat behind the driver.  Officer Miller, who was then a five-year K-9 officer trained in the identification and detection of narcotics, detected a faint odor of marijuana coming from the Caprice.

Officer Halstead, with the materials in hand just furnished by the driver, asked the driver whether there were any guns, knives, drugs or anything illegal in the car.  The driver answered that there were none.  Officer Halstead then asked if he and Officer Miller may search the car and the driver responded that would be fine ("first consent").  Without then conducting a search, Officer Halstead went back to his cruiser to examine the papers the driver had handed to him.  Officer Miller joined him there and, because he had smelled marijuana while at the Caprice, asked to examine the driver's license and the registration at which time and on which he could smell marijuana.  It was the smell of burnt marijuana.

A comparison of the temporary registration card and the permanent registration card, both issued during the preceding month, reflected that the Department of Motor Vehicles ("DMV") had issued the wrong license plate for the Caprice.  The license plate issued by the DMV and placed on the Caprice was ORL 776, whereas it should have been ORL 770.  About five minutes had elapsed from the beginning of the stop when Officer Halstead went back to the Caprice to ask the driver, James Collins, to exit the vehicle and brought him back to his cruiser where he explained the mistake that had been made.

3

At that point Officer Miller took possession of the papers the driver had furnished.  He had the driver to accompany him to his cruiser where he showed the driver on his computer what had occurred, noting that the DMV had made the mistake, and told the driver what he needed to do to get it corrected.  Officer Miller testified that the traffic stop had by that time ended.  No citation was issued.

As Officer Miller and James Collins walked back to the rear of the Caprice, Officer Miller asked whether there was anything illegal in the vehicle, to which James Collins said "no."  Officer Miller then asked, with all the papers furnished by the driver still in his hands, for his consent to the search of the Caprice.  James Collins agreed to the search ("the second consent").  By that time, as much as another five minutes may have elapsed.

Officer Miller then directed George Sawyer to vacate the back seat and walk back to Officer Halstead at the cruiser.  Officer Miller then went around to the right side of the Caprice and asked the defendant, Antonio Collins, to exit the vehicle and go back to Officer Halstead who, by the time the defendant got to him, had patted down George Sawyer with his consent, finding him in possession of marijuana for which Sawyer was placed under

arrest and directed to sit on the curb.  The quantity of marijuana was later found to be 12.2 grams and Sawyer was charged with misdemeanor possession.

As indicated from the sequence of events set out in the Offense Report of Officers Halstead and Miller filed the next day, at about the same time Sawyer was patted down, James Collins, who was also patted down, was asked if he had any "illegal contraband" on him whereupon he pulled a small plastic baggie containing a white chunky substance, consistent with the packaging and appearance of crack cocaine, from within his clothing in the area of his buttocks.  He was placed under arrest at that time but was later released at the South Charleston Police Department headquarters when the substance, perhaps headache medication, tested negative on a field test kit.  It was described in the Officers' Offense Report as "Fake Crack."

As the defendant approached Officer Halstead, the defendant stated that he recognized Officer Halstead from the time a little over a year earlier when both the defendant and Officer Halstead were at South Central Regional Jail where Officer Halstead was then a correctional officer and the defendant an inmate.  The defendant was remembered by Officer Halstead as having been placed in the convicted felon pod.

Officer Halstead responded that he, too, remembered the defendant.  He also remembered that the defendant was an individual of possible violence inasmuch as the defendant had struck another corrections officer in the face with a food tray.

Officer Halstead asked the defendant if he could conduct a <u>Terry</u> frisk of him at which time the defendant put his hands up in the air and stated, "Whoa, Whoa, I know my rights." Officer Halstead responded that he needed to conduct a simple pat search of the exterior of his body, being the exterior of his clothes, to make sure the defendant had no weapons on him.  With that, the defendant "turned around," an act Officer Halstead apparently interpreted to be a consent to the pat down although the defendant did not say yes.  A minute or so prior to that time, Sergeant Connally of the Dunbar Police Department arrived in his cruiser with his canine, he having been called to the scene by Officer Miller to assist in the search of the Caprice. Officer Miller wished to see whether the canine, "if there was anything in the vehicle, he could pinpoint exactly where the marijuana, drugs or anything in the vehicle could have been at the time."

During the pat down, which Officer Halstead testified he performed for officer safety, he found in defendant's front

6

waistband a Cobray Model—12 .380 caliber handgun.  Officer Halstead called out "Gun," secured the firearm and placed the defendant under arrest.  He then conducted a further search of the defendant incident to that arrest and found approximately 1.6 grams of crack cocaine in the defendant's right front pocket.

The canine made a search of the exterior of the Caprice and alerted on the "rear passenger side of the vehicle."  The canine then entered the Caprice and searched it.  After the canine search, with "the defendants . . . in handcuffs" (presumably meaning all three occupants of the Caprice), Officer Miller and one of the other officers then entered the Caprice and searched it.  Apparently, no contraband was found as a result of the search of the Caprice.  All three of the occupants of the Caprice were transported to South Charleston Police Department headquarters and the Caprice was towed by a wrecker service.  The defendant was taken to the county magistrate's office where he made bond.

Throughout the period of the stop down through the second consent to search the Caprice, the only two officers present, Halstead and Miller, were courteous and professional and helpful to the driver, James Collins.  They explained to him the mistake made by the DMV, how it could be corrected and that it

was not his fault.  In response to his concern that the vehicle may be towed, the officers informed him that it would not, although they also explained to him that he may be pulled over if he drove the vehicle before correcting the problem.  They did not threaten him at any time prior to his second consent to search.  Though armed, the officers' weapons were never drawn.  The third and last officer on the scene, Sergeant Connally, arrived shortly after the second consent.  The driver, James Collins, remained calm throughout the period that elapsed down to and including his giving of consent to search for the second time.

## II.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV.  Our court of appeals recently revisited the Fourth Amendment standards governing a routine traffic stop:

> It is well established that the "[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure,'" no matter how brief the detention or how limited its purpose. "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."

>Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. Thus, pursuant to such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." . . .
>
>The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose. Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way."

United States v. Branch, 537 F.3d 328, 335-36 (4th Cir. 2008) (citations omitted).

The rule governing a further detention beyond the scope of a routine traffic stop was discussed as well:

>If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place. Thus, a prolonged automobile stop requires either the driver's consent or a "reasonable suspicion" that illegal activity is afoot. While a precise articulation of what constitutes "reasonable suspicion" is "not possible," the precedents of the Supreme Court and this circuit suggest several principles that should animate any judicial evaluation of an investigatory detention pursuant to Terry[v. Ohio, 392 U.S. 1 (1968)].

Id. at 336 (citations omitted).

9

In <u>United States v. Black</u>, 525 F.3d 359, 364 (4th Cir. 2008), the court of appeals discussed the requirements of <u>Terry</u>:

> But when a police officer, during a voluntary encounter or otherwise, "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may temporarily seize and detain a citizen. Moreover, in connection with such a seizure or stop, if presented with a reasonable belief that the person <u>may be armed and presently dangerous</u>, an officer may conduct a protective frisk.

<u>Id.</u> at 364 (emphasis added) (citations omitted); <u>see also</u> <u>Arizona v. Johnson</u>, 129 S. Ct. 781, 786 (2009) ("Citing <u>Terry</u> as controlling, the Court further held that a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver '<u>might be</u> armed and presently dangerous.") (emphasis added)(quoting <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 112 (1977).[1]

There are several points in this law-enforcement/ citizen encounter that require analysis. Each one is addressed in turn below.

---

[1] In the opening paragraphs of <u>Johnson</u>, Justice Ginsburg offered a formulation of the <u>Terry</u> standard somewhat at variance with the decisional law preceding <u>Johnson</u>. Specifically, she stated the second step required that "the police officer must reasonably suspect that the person stopped <u>is armed</u> and dangerous." <u>Johnson</u>, 129 S. Ct. at 784 (emphasis added). Inasmuch as Justice Ginsburg later in her opinion quotes the formulation appearing in <u>Mimms</u>, without comment, the court attributes no particular significance to the language in the opening paragraphs.

A.   Validity of the Initial Stop

First, one must determine if the initial stop of the vehicle was lawful, along with the law enforcement request that the driver exit the vehicle so that the DMV error and its remedy might be explained, ultimately with the aid of Officer Miller's computer.  Inasmuch as law enforcement noticed an irregularity with the vehicle license plate, the stop and the request of the driver to exit the vehicle appear to pass constitutional muster. See <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977) ("We hold . . . that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").[2]

---

[2]Inasmuch as the vehicle was lawfully detained, the court attributes little significance to the fact that the driver was asked to exit after the DMV error was noticed by the officers when they checked the registration.  The better course may have been to explain the error at the driver's vehicle and inquire if he wished a further explanation.  The fact that the officers went to greater lengths to explain the DMV error in the first instance though, by having the driver exit and ultimately view the error with the aid of the cruiser computer terminal, is not deemed to offend the Fourth Amendment.

**B.   Continuation of the Stop After Law Enforcement Advised the Driver of the Error Committed by the DMV**

As noted, Officer Miller, was trained to identify and detect narcotics.  He noticed a faint odor of marijuana coming from the Caprice.  After examining the driver's license and the registration, he again smelled the aroma of burnt marijuana.  In <u>United States v. Scheetz</u>, 293 F.3d 175 (4th Cir. 2002), law enforcement officers were manning a checkpoint for, <u>inter</u> <u>alia</u>, narcotics interdiction purposes.  Officers stationed some distance away from the checkpoint noticed a vehicle approach the signs announcing the checkpoint and then perform an illegal u-turn to avoid being stopped.  Law enforcement then pursued and detained the vehicle.

Two law enforcement officers approached the driver's side of a vehicle.  They requested a license and vehicle registration card from the driver.  Another officer approached the passenger side of the vehicle and signaled to his confederates that he detected the odor of marijuana coming from the vehicle's interior.  The other two officers on the driver's side smelled the same strong odor.

The officers directed the driver to exit the vehicle. After the driver refused to consent to a search of the vehicle,

the officers examined a knapsack located inside the vehicle and found it to contain marijuana.  The court of appeals observed, inter alia, as follows:

> Once the car was properly stopped and the narcotics officers smelled marijuana, the narcotics officers properly conducted a search of the car. United States v. Morin, 949 F.2d 297, 300 (10th Cir. 1991) (holding that, because marijuana has a distinct smell, "the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage").

Id. at 184.  More recently, the court of appeals reiterated its conclusion concerning the significance of the odor of marijuana in the Fourth Amendment context:

> We have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place. In United States v. Scheetz, 293 F.3d 175, 184 (4th Cir.2002), for example, <u>we held that the smell of marijuana emanating from a properly stopped automobile constituted probable cause to believe that marijuana was in the vehicle</u>, justifying its search.  Similarly, in United States v. Cephas, 254 F.3d 488, 495 (4th Cir. 2001), we recognized that the strong smell of marijuana emanating from an open apartment door 'almost certainly' provided the officer with probable cause to believe that marijuana was present in the apartment. See also United States v. Sifuentes, 504 F.2d 845, 848 (4th Cir.1974) (holding that officers' sight of boxes inside a van coupled with the strong odor of marijuana permitted seizure of the boxes because they were in "plain view, that is, obvious to the senses"). <u>While smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is.  Thus, when marijuana is believed to be present in an automobile based on the odor emanating therefrom, we have found probable cause to search the automobile, and when the odor of marijuana emanates from an apartment, we have found</u>

**that there is "almost certainly" probable cause to search the apartment**. <u>United States v. Humphries</u>, 372 F.3d 653, 658 (4th Cir. 2004) (emphasis supplied); <u>see</u> <u>also</u> <u>United States v. Kellam</u>, 568 F.3d 125, 136 (4th Cir. 2009) (citing <u>Scheetz</u> as "concluding that [the] odor of marijuana coming from [a] properly stopped vehicle satisfies probable cause for [a] search of [the] vehicle and baggage therein . . . .").

Based upon Officer Miller's detection of the odor of marijuana and burnt marijuana, the officers were justified in detaining the driver and the vehicle, in order to search it, beyond the time that the driver learned from them of the DMV error. The same justification warranted the officers' direction to the occupants to exit the vehicle so as to enable first the canine and then the officers to conduct the search of the Caprice, as they appropriately did in light of the probable cause arising from the aroma of marijuana.[3]  <u>See</u> <u>also</u> <u>Branch</u>, 537 F.3d

---

[3] In view of the odor of marijuana justifying a search of the Caprice, the court need not address the United States' additional contention that the driver consented to the search. The officers' retention of the driver's license here would militate against a finding that either consent was validly obtained. In <u>United States v. Weaver</u>, 282 F.3d 302 (4th Cir. 2002), the court of appeals observed as follows: "the retention of a person's identification is an important factor in determining whether a 'seizure' within the meaning of the Fourth Amendment occurred." <u>Id.</u> at 311. That retention was deemed especially significant when it occurs during the course of a

(continued...)

14

at 336 ("Thus, a prolonged automobile stop requires either the driver's consent or a "reasonable suspicion" that illegal activity is afoot.").

C.  The Request that the Defendant Exit the Vehicle

The next question involves Officer Miller's request that the defendant exit the vehicle. In Maryland v. Wilson, 519 U.S. 408 (1997), the Supreme Court concluded that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id. at 415. Despite the fact that the DMV error would have, without more, perhaps allowed the officers to let the driver go on his way, the vehicle was

---

³(...continued)
routine traffic stop:

> [R]etention of one's driver's license would have effectively seized the individual because it is illegal to drive without a license in one's possession. In the context of a traffic stop, if an officer retains one's driver's license, the citizen would have to choose between the Scylla of consent to the encounter or the Charybdis of driving away and risk being cited for driving without a license. That is, of course, no choice at all, and that is why, in those cases, the retention of one's license is a highly persuasive factor in determining whether a seizure occurred.

Id. It is noted, however, that driving away here would continue to be imbued with the risk of being cited for the same violation until the proper plate was obtained; and the circumstances surrounding the stop were relatively benign when the consents to search were received.

properly detained further following the initial stop after the odor of marijuana was detected.  The request that the occupants exit the vehicle was thus constitutionally permissible.

D.   The Protective Frisk of the Defendant

Next, the court must determine if Officer Halstead was authorized to conduct a protective frisk of defendant.  In Arizona v. Johnson, 129 S. Ct. 781 (2009), the Supreme Court addressed the authority of police officers to stop and frisk a motor vehicle passenger when the automobile has been temporarily seized for a traffic offense.  In permitting such safety sweeps, the decision in Johnson stressed the following principle of officer and occupant safety:

> [T]he Court has recognized that traffic stops are "especially fraught with danger to police officers." "'The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized,' " we have stressed, " 'if the officers routinely exercise unquestioned command of the situation.' "

Id. at 786 (citations omitted).  Assuming Officer Halstead did not properly interpret defendant's body language as consent to a pat-down, the circumstances confronting Officer Halstead justified it.

The defendant and Officer Halstead recognized one another almost immediately when the defendant exited the vehicle.

16

Officer Halstead, while serving as a correctional officer, knew that defendant had been in custody in the convicted felon pod at the facility where Officer Halstead was serving. He also knew that defendant had a propensity for violence inasmuch as defendant had previously attacked another corrections officer by hitting him in the face with a food tray. The fact that defendant, while incarcerated, attacked one of his custodians is a sobering one indeed for an officer who is trying to maintain safety and control during a traffic stop in a business mall area as night time descends. These facts justified a reasonable belief by Officer Halstead that the defendant might be armed and presently dangerous. The protective frisk was thus justified under the Fourth Amendment. Further, once the weapon was found and defendant arrested, a further search of his person was also sacrosanct. See, e.g., United States v. Kellam, 568 F.3d 125, 136 (4th Cir. 2009) ("[T]he search of Kellam's person was incident to a lawful arrest. See Chimel v. California, 395 U.S. 752, 762-63 . . . (concluding that search incident to lawful arrest does not violate Fourth Amendment).").

17

III.

Based upon the foregoing, the court discerns no Fourth Amendment violation during the course of events leading up to and including defendant's arrest.  The court, accordingly, ORDERS that the motion to suppress evidence be, and it hereby is, denied.

The Clerk is directed to forward copies of this memorandum opinion and order to the defendant, all counsel of record and the United States Marshal.

DATED:  August 11, 2009

John T. Copenhaver, Jr.
United States District Judge